**Marianne BIHARI and Bihari Interiors, Inc., Plaintiffs,**

v.

**Craig GROSS and Yolanda Truglio, Defendants.**

**No. 00 Civ. 1664(SAS).**

United States District Court, S.D. New York.

Sept. 25, 2000.

eral agency. *See Federal Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 484–485, 114 S.Ct. 996, 1005, 127 L.Ed.2d 308 (1994).

Brian E. Maas, Wendy Stryker, Beldock Levine & Hoffman, LLP, New York, NY, for Plaintiffs.

Anne W. Salisbury, Russell H. Falconer, Baker Botts, L.L.P., New York, NY, for Defendants.

## *OPINION AND ORDER*

SCHEINDLIN, District Judge.

Plaintiffs Marianne Bihari and Bihari Interiors, Inc. (collectively "Bihari") move to preliminarily enjoin defendants Craig Gross and Yolanda Truglio (collectively "Gross") from using the names "Bihari" or "Bihari Interiors" in the domain names or metatags of any of their websites ("the Gross websites"), claiming that such use violates the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d)(1), and infringes on Bihari's common-law service mark in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A). Additionally, Bihari moves to enjoin defendants from publishing defamatory statements against Bihari and Bihari Interiors on the Gross websites, contending that the defamatory statements constitute common law libel.[1]

I have reviewed Bihari's Complaint, Motion for Preliminary Injunction, Amended Complaint, Supplemental Memorandum of Law, and Reply Memorandum of Law, and I have also reviewed defendants' Answer and Opposing Memorandum of Law. A telephone conference with all counsel, addressing the merits of the case, was held on August 28, 2000. Neither party has requested an evidentiary hearing. For the reasons set forth below, Bihari's motion for preliminary injunctive relief is denied.

## I. Introduction

Although the Internet has become part of our daily life, its technological aspects largely remain a mystery to all but the most savvy. A brief review of the fundamentals should prove useful. The Internet is an international network of interconnected computers that enables tens of millions of people, if not more, to communicate with one another and to access vast amounts of information from around the world. *See Reno v. American Civil Liberties Union*, 521 U.S. 844, 850, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). Information on the Internet is housed on webpages.

When searching for information on the Internet, an individual user may choose one of two search techniques. The first involves conducting a specific domain name [2] search, in which the user types the company name or logo followed by the suffix ".com". A news network such as CNN, for example, has the website "cnn.com". However, companies will often choose as a domain name one that does not precisely reflect their company name. For instance, the domain name for the New York Times is "nytimes.com". If an Internet user were to type the domain name "newyorktimes.com", the user would arrive at a site unaffiliated with the New York Times but devoted to readers' comments about the New York Times.

Because entering the company's name as the domain name often fails to take the user to the desired webpage, many users

---

1. Bihari's Amended Complaint asserts six claims against Gross. Although plaintiffs moved for a preliminary injunction based on the Amended Complaint, in its entirety, an examination of plaintiffs' Memorandum of Law reveals that the preliminary injunction is sought pursuant only to plaintiffs' federal claims and common law libel claim. Therefore, the other three claims—trademark dilution under state law, common law unfair competition, and intentional interference with prospective business relations—are not pertinent to resolution of this preliminary injunction motion.

2. A domain name, the address given to a webpage, consists of two parts: a top level domain and a secondary level domain.

prefer the second search technique. Here, a websurfer enters a particular company name or search request in a search engine. The search engine then displays a list of websites that match the user's request. The search engine ranks the relevant sites according to the relative frequency with which the word or phrase appears in the metatags [3] and in the text of the websites. The websurfer then chooses, based on any number of considerations, which website to visit. Most often, that choice is based on the domain name listed for each search result and a brief description of each webpage provided by the search engine.

## II. Background

### A. The Failed Contract

Marianne Bihari is an interior designer who has been providing interior design services in New York City, New Jersey, Connecticut, California, Florida and Italy since 1984. *See* 3/3/00 Affidavit of Marianne Bihari in Support of Plaintiffs' Motion for a Preliminary Injunction ("Bihari Aff.") ¶ 2. Since 1989, she has been continuously doing business as Bihari Interiors or Marianne Bihari d/b/a Bihari Interiors. *See id.* The Bihari Interiors name is well known, particularly in the New York City high-end residential interior design market. *See id.* ¶¶ 2, 4. Bihari does not engage in paid advertising to promote her services; rather, she relies on referrals from clients and other design-industry professionals. *See id.* ¶ 3.

Craig Gross is a former client of Bihari Interiors. *See id.* ¶ 1. Yolanda Truglio is Gross's girlfriend. *See id.* ¶ 21. On February 12, 1998, Gross, on behalf of 530 East 76th Street, Inc., retained Bihari Interiors to provide interior and architectural design services for his condominium apartment on East 76th Street ("the Con-

tract"). *See* Amended Complaint ¶ 13; Defendants' Answer to Plaintiffs' Amended Complaint ("Answer") ¶ 14. For various reasons not relevant to this action, the relationship between Bihari and Gross soured, and the Contract was never completed. *See* Amended Complaint ¶¶ 17–25.

On June 14, 1999, Gross filed suit against Marianne Bihari and Bihari Interiors in New York State Supreme Court alleging fraud and breach of contract ("the State Suit"). *See id.* ¶ 26. On August 12, 1999, Gross submitted an amended verified complaint in the State Suit ("the First Amended Complaint"). On April 3, 2000, the state court dismissed two of the fraud claims, but granted Gross a right to replead one of those claims. *See* Amended Complaint ¶ 94; 8/4/00 Affidavit of Craig Gross in Opposition to Motion for a Preliminary Injunction ¶ 5 ("Gross Aff."). Gross has since filed a second amended complaint which is currently pending in New York State Supreme Court ("the Second Amended Complaint"). *See* Gross Aff. ¶ 5.

### B. The Alleged Harassment

Approximately two months after Gross first filed the complaint in the State Suit, on August 10, 1999, Bihari, Gross and Truglio engaged in settlement negotiations, which were ultimately unsuccessful. *See* Amended Complaint ¶¶ 27–29. Four days later, Gross registered the domain names "bihari.com" and "bihariinteriors.com". *See id.* ¶ 31. On August 16, 1999, Bihari received an anonymous facsimile alerting her to the website. *See id.* ¶ 32. The following day, Bihari accessed the website "www.bihariinteriors.com". *See id.* ¶ 36. Disturbed by the unauthorized use of her name and her business name in the domain name, as well as the disparaging statements on the website, Bihari con-

---

**3.** A metatag is hypertext markup language ("HTML") code, invisible to the Internet user, that permits web designers to describe their webpage. There are two different types of metatags: keyword and description. The keyword metatag permits designers to identify search terms for use by search engines. Description metatags allow designers to briefly describe the contents of their pages. This description appears as sentence fragments beneath the webpage's listing in a search result.

tacted her attorney. *See* Bihari Aff. ¶¶ 26, 27. On August 31, 1999, Bihari's attorney sent a letter to Gross demanding that he terminate the website. *See* Amended Complaint ¶ 40. Rather than complying with Bihari's demand, Gross delivered to Bihari's residence pens bearing the words "w ww.bihariinteriors.com".[4] *See id.* ¶ 44. In addition, Bihari alleges that subsequent to the delivery of the pens, Bihari received frequent "hang-up telephone calls" which lasted until approximately November 22, 1999. *See id.* ¶¶ 45, 48.[5] Bihari filed a criminal complaint for aggravated harassment against Gross and Truglio on October 3, 1999, but the District Attorney's office declined to prosecute. *See id.* ¶¶ 46, 47.

Bihari was the subject of a criminal complaint several months later. Before the contract relationship between Gross and Bihari deteriorated, Bihari Interiors sold Gross three sofas purchased from a vendor. *See* Amended Complaint ¶ 49. Bihari Interiors made the initial payments for the sofas. *See id.* By the terms of the Contract, if Bihari Interiors failed to pay in full by a certain date, the vendor would be free to resell the sofas. *See id.* ¶ 50. After the payment deadline expired, Gross paid the vendor the balance due on the sofas, thereby avoiding payment of Bihari Interiors' commission. *See id.* ¶ 51; Answer ¶ 51. The sofas, however, were not delivered to Gross, but to Bihari, who took possession of them pending resolution of the State Suit. *See* Amended Complaint ¶ 52. Bihari alleges that Gross then filed a criminal complaint against her for theft of the sofas. *See id.* ¶ 53. On December 20, 1999, Bihari was arrested, held for approximately six hours, and "charged with criminal possession of stolen property in the fifth degree, a misdemeanor offense." *Id.* ¶ 56. On January 24, 2000, Bihari was informed that the District Attorney's office

had declined to prosecute her case. *See id.* ¶ 57.

## C. The Websites

On March 7, 2000, Bihari served Gross with the instant Complaint and motion for injunctive relief. *See id.* ¶ 58. Gross then offered to take down the "bihariinteriors.com" website pending a preliminary injunction hearing. *See id.* ¶ 59. He has since relinquished the domain names "bihari.com" and "bihariinteriors.com" and is taking all necessary steps to return those domain names to Network Solutions, Inc., the provider of domain name registrations. *See* 8/29/00 Letter of Defendants' Attorney Anne W. Salisbury to the Court ("8/29/00 Salisbury Letter").

On March 7, 2000, the day that Bihari served Gross with the Complaint, Bihari also learned of another website created by Gross, "designscam.com", by using an Internet search engine and searching for the words "Bihari Interiors". *See id.* ¶ 60. Bihari discovered that the "designscam.com" website contained the same content as the "bihariinteriors.com" website. *See id.* ¶¶ 60, 61. Then, on March 11, 2000, Gross registered a fourth website, "manhattaninteriordesign.com", containing the identical material as "designscam.com". *See id.* ¶ 63.

All of the Gross websites use "Bihari Interiors" as metatags embedded within the websites' HTML code. *See id.* ¶ 66. The description metatags of the Gross websites state "This site deals with the problems experienced when hiring a new [sic] York City (Manhattan) designer. It discusses Marianne Bihari[,] fraud and deceit and interior decorating." *See* 3/3/2000 Affidavit of John Running, a computer systems administrator and HTML programmer employed by Bihari's attorneys, in

---

4. Gross admits that he delivered these pens to Bihari's residence. *See* Answer ¶ 44.

5. Bihari contends that because her phone was equipped with caller identification, she could

identify the source "for several of the calls as being defendants' home." *Id.* ¶ 45. Gross and Truglio deny making these phone calls. *See* Answer ¶¶ 45, 48.

Support of Plaintiffs' Motion for a Preliminary Injunction ("Running Aff.") ¶ 13.

### D. The Website Content

Each of the Gross websites is critical of Bihari and her interior design services. An Internet user accessing any of the websites first sees a large caption reading "The Real Story Behind Marianne Bihari & Bihari Interiors." *See id.* ¶ 72. Directly beneath this title are three photographic reproductions of scenic New York. *See id.* ¶ 73. Beneath the photographs is a counter indicating how many visitors the website has had. As of June 26, 2000, the counter indicated that 9,774 people have visited the website since August 15, 1999. *See* Print-out of "manhattaninteriordesign.com" Website, Ex. E to Plaintiffs' Amended Notice of Motion. Also appearing on the first page of the websites are various hyperlinks [6] including "Tips on Picking a Designer," "New York City Information," "Who's Who in Interior Design," "Kabalarians Philosophy," "A Humorous Look," "Tell A Friend," "Send E–Mail," "Sign or Read the Guest Book," and "Participate in the Bihari Poll." *Id.*

A long block of text appears beneath these hyperlinks and it states:

> Welcome to the first web site designed to protect people from the alleged ill intentions of Marianne Bihari & Bihari Interiors. Keep in mind that this site reflects only the view points and experiences of one Manhattan couple that allegedly fell prey to Marianne Bihari & Bihari Interiors. There possibly may be

others that have experienced similar alleged fraud and deceit from Marianne Bihari & Bihari Interiors. Please feel free to e-mail us if you think you were victimized by Marianne Bihari & Bihari Interiors. Our goal is to protect you from experiencing the overwhelming grief and aggravation in dealing with someone that allegedly only has intentions to defraud. If you think you need advice before entering into a contract with Marianne Bihari & Bihari Interiors—Please Click Here.

*See id.;* Amended Complaint ¶¶ 78, 79.

Below this text a viewer finds additional hyperlinks to "The Initial Meeting," "The Contract," "The Scam," and "The Law Suit" [sic]. *See* Amended Complaint ¶ 80. Viewers who connect with these links do not immediately receive the information, but are told that if they send an e-mail, they will receive a copy of the requested information. *See id.* ¶ 81.

In addition to these comments, the Gross websites contain a "guestbook" where visitors leave messages for other visitors to the websites. *See id.* ¶ 83. Some of the guestbook entries indicate that potential clients declined to retain Bihari's services because of the Gross websites. *See id.* ¶ 86. Other messages simply comment or inquire about the Gross websites' design. *See* Guestbook Entries for "www.bihariinteriors.com" from 3/1/2000 ("Guestbook Entries"), Ex. B. to Bihari Aff. Many other entries disparage Bihari and Bihari Interiors.[7] *See* Amend-

---

6. A hyperlink is " 'highlighted text or images that, when selected by the user, permit[s][her] to view another, related Web document.' " *Bensusan Restaurant Corp. v. King*, 126 F.3d 25, 27 n. 1 (2d Cir.1997).

7. Bihari provides six examples of disparaging guestbook entries, which she seeks to enjoin:

    a. Finally someone who speaks the truth about this horrible interior decorator. I myself fell victim to this company and have been to [sic] ashamed to speak until coming across this web site. Thank you for sharing your suffering. I no longer feel alone. Sincerely, Mr. Taken Advantage.

    b. Rumor has it this designer recently stepped over the line . . . She may soon find herself in new surroundings (if you know what I mean).

    c. Knowing Marianne Bihari this site does not surprise us . . . Rumor has it she is in a little tangle with another showroom in our building. Sincerely, Friends of Bihari Victims.

    d. How is it possible that this woman can get away with all you claim? Is there no justice in the world, or at least in New York.

    e. My friend invited me to her New Years Eve party last night. Conversation

ed Complaint ¶ 87. Bihari alleges that many of the guestbook entries were written by Gross and Truglio, and do not reflect true dissatisfaction with Bihari or Bihari Interiors. *See id.* ¶ 85.[8]

The "designscam.com" and "manhattaninteriordesign.com" websites also contain a box which presents in blinking green letters the following incomplete statement quoted from Bihari's March 3, 2000 Affidavit: "I was arrested and charged with criminal possession of stolen property in the Fifth Degree." *See id.* ¶ 62. Gross neither includes the rest of the sentence—which reveals that the arrest was for a misdemeanor offense—nor informs the reader that the District Attorney's Office declined to prosecute the case. *See id.*

In June 2000, Gross launched amended versions of the "designscam.com" and "manhattaninteriordesign.com" websites. *See id.* ¶ 90. The new websites are substantially identical to the former version, with two exceptions. *See id. First,* Gross deleted the statement, "Our goal is to protect you from experiencing the overwhelming grief and aggravation in dealing with someone that allegedly only has intentions to defraud." *See id.* ¶ 93. *Second,* he added two hyperlinks—from the words "alleged fraud" and "lawsuit"—to a copy of the First Amended Complaint in the State Suit. *See id.* ¶ 94.

### E. Motive and Intent

The parties dispute defendants' motive and intent in creating the websites. Bihari alleges that Gross's motive was to harass Bihari and to pressure her into settling the

State Suit. *See* Bihari Aff. ¶ 23. Gross counters that he created the websites because he was disturbed by Bihari's "deceitful practices," and was "dedicated to assisting consumers who are in the process of choosing a designer in New York City, as well as informing others of my experiences with Bihari." Gross Aff. ¶ 7. While there is no direct proof that Gross's motive is to pressure Bihari to settle the State Suit, there is proof that Gross intends to harm Bihari's business. Gross's specific intent, as memorialized in his own words on his websites, is to warn potential customers of Bihari's "alleged ill intentions" and to "protect" them from experiencing "the overwhelming grief and aggravation" he has experienced in dealing with Bihari. Amended Complaint ¶ 79. Undeniably, Gross's intent is to cause Bihari commercial harm.

### III. Applicable Legal Standard

"Because of the great potential for harm which may occur from the issuance of a preliminary injunction, the party seeking the injunction must sustain a heavy burden." *Ringling Brothers–Barnum & Bailey Combined Shows, Inc. v. B.E. Windows Corp.,* 937 F.Supp. 204, 207 (S.D.N.Y. 1996). The party seeking such relief must demonstrate: (1) likelihood of irreparable harm should the injunction be denied; and (2) either (a) likelihood of ultimate success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking relief. *See SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc.,* 211 F.3d 21, 24 (2d

---

came up about M. Bihari. Is there any truth regarding her arrest?

 f. Bihari behind bars? Is this true? If it is, why wouldn't this site have the details. Please enlighten us.

Amended Complaint ¶ 87.

8. Bihari submitted two affidavits to support this allegation. The first affidavit was written by her friend George Manos, who stated that of the fifty guestbook entries in the "www.bihariinteriors.com" guestbook, eighteen were signed by individuals who left their e-mail

addresses. *See* 3/2/00 Affidavit of George Manos in Support of Plaintiffs' Motion for a Preliminary Injunction ("Manos Aff.") ¶ 3. Manos sent an e-mail message to those eighteen individuals, but twelve of those e-mail messages were "bounced back" to him. *Id.* ¶ 4. From this fact, John Running concluded in his affidavit that "some other individuals left the guestbook messages and signed with a phony e-mail address." *See* Running Aff. ¶ 17.

Cir.2000); *Maryland Cas. Co. v. Realty Advisory Board on Labor Relations*, 107 F.3d 979, 984 (2d Cir.1997).

## IV. Discussion

### A. The Lanham Act Claims

#### 1. Irreparable Harm

■ "Irreparable harm is an injury that is not remote or speculative but actual and imminent, and for which a monetary award cannot be adequate compensation." *Tom Doherty Assocs. v. Saban Entertainment, Inc.*, 60 F.3d 27, 37 (2d Cir.1995) (internal citations omitted). In a trademark infringement case, a presumption of irreparable harm arises where a plaintiff makes a showing of likelihood of confusion. *See Tough Traveler, Ltd. v. Outbound Products*, 60 F.3d 964, 967 (2d Cir.1995); *Standard & Poor's Corp. v. Commodity Exchange, Inc.*, 683 F.2d 704, 708 (2d Cir. 1982). A showing of likelihood of confusion, therefore, will establish the irreparable harm requisite for a preliminary injunction.

#### 2. Likelihood of Success on the ACPA Claim

■ On November 29, 1999, Congress adopted the ACPA "to remedy the perceived shortcomings of applying the FTDA [Federal Trademark Dilution Act] in cybersquatting cases." *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 495 (2d Cir.2000). To establish a claim of cybersquatting, a plaintiff must show: (1) that she had a distinctive mark at the time of the registration of the domain name; (2) that the defendant "registers, traffics in, or uses a domain name" that is identical or confusingly similar to that mark; and (3) that the defendant has "a bad faith intent to profit from that mark." 15 U.S.C. § 1125(d)(1).[9] A pre-

liminary injunction is a remedy authorized by the ACPA. *See* 15 U.S.C. § 1116(a).

In March 2000, Bihari claimed that Gross's registration of "bihari.com" and "bihariinteriors.com" violated the ACPA because he registered the confusingly similar domain names with a bad faith intent to profit by pressuring Bihari into settling the State Suit at terms favorable to Gross. Since then, Gross has abandoned those two websites and promised to transfer the domain names back to Network Solutions, Inc. *See* 8/29/00 Salisbury Letter.

However, during the August 28 telephone conference, Bihari's attorney claimed that use of "Bihari Interiors" in the metatags violates the ACPA. Neither Bihari's attorney, nor this Court, has been able to find a single case applying the ACPA to metatags. Although no court has expressly stated that the ACPA does not apply to metatags, the plain meaning of the statute and its legislative history make this conclusion apparent. *See* 15 U.S.C. § 1125(d)(A)(1)(ii) (ACPA provides an action against one who "registers, traffics in, or uses *a domain name* ....") (emphasis added); *Mattel, Inc. v. Internet Dimensions Inc.*, 99 Civ. 10066, 2000 WL 973745 at *2 (S.D.N.Y. July 13, 2000) (Congress's purpose in adopting the ACPA was to "*protect consumers and American businesses* ... by prohibiting the bad-faith and abusive registration of distinctive marks as *Internet domain names* ....") (quoting S.Rep. No. 106–140, at 4 (1999)) (emphasis added). Therefore, the ACPA is no longer a basis for preliminary injunctive relief as Gross has voluntarily relinquished the Bihari domain name.

#### 3. Likelihood of Success on the Trademark Infringement Claim

A claim of trademark infringement under § 43(a) of the Lanham Act requires the plaintiff to show (1) that she has a

---

9. If a plaintiff can show that her mark was famous at the time the defendant registered the domain name, she can prove a violation of the ACPA by showing a bad faith intent to

profit and that the domain name "is identical or confusingly similar to *or dilutive of that mark.*" 15 U.S.C. § 1125(d)(1) (emphasis added).

valid mark that is entitled to protection under the Lanham Act, and (2) that use of that mark by another "is likely to cause confusion ... as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of [the defendant's] goods, services, or commercial activities by another person." [10] 15 U.S.C. § 1125(a)(1)(A); *Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1508–09 (2d Cir. 1997). As discussed more fully below, Bihari has failed to demonstrate a likelihood of success on the merits of this claim because Gross's use of the "Bihari Interiors" mark in the metatags is not likely to cause confusion and is protected as a fair use.

### a. The Strength of Bihari's Mark

"Bihari Interiors" is not a registered trademark with the United States Patent and Trademark Office. Rather, Bihari claims that she is entitled to a common-law service mark.[11] Registration is not a prerequisite to protection under § 43(a) of the Lanham Act. *See Forschner Group, Inc. v. Arrow Trading Co.*, 124 F.3d 402, 407 (2d Cir.1997). The four judicially-developed categories of trademarks, listed in ascending order of their strength are (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *See Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 391 (2d Cir.1995); *Abercrombie & Fitch Co. v.*

*Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976). A generic mark can never be protected, but a descriptive mark can obtain registration if it has acquired "secondary meaning." *See Lane Capital*, 192 F.3d at 344. "Fanciful, arbitrary and suggestive marks are deemed inherently distinctive. Their intrinsic nature serves to identify a particular source of a product, so they will be automatically protected" without a showing of secondary meaning. *Id.* A term is descriptive if it "tells something about a product, its qualities, ingredients or characteristics." *Estee Lauder Inc.*, 108 F.3d at 1509. In contrast, a term is suggestive if it "requires imagination, thought, and perception to reach a conclusion as to the nature of the goods" or services it represents. *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1039 (2d Cir.1992).

Generally, personal names used as trademarks are regarded as descriptive terms, protected only if they have acquired distinctive and secondary meaning. *See Lane Capital*, 192 F.3d at 345; *Abraham Zion Corp. v. Lebow*, 761 F.2d 93, 104 (2d Cir.1985). However, "Bihari Interiors" is a suggestive rather than a descriptive mark because it suggests Bihari's services. The mark requires an imaginative leap to correctly identify Bihari's services. The word "interiors" does not immediately identify interior design services. It could

---

10. Section 43(a) of the Lanham Act states:
    (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact—which
    (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
    (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of

his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
15 U.S.C. § 1125(a)(1).

11. Service marks are essentially trademarks used in the sale of services, instead of goods. Both service marks and trademarks are governed by identical standards. *See, e.g., Lane Capital Management v. Lane Capital Management*, 192 F.3d 337, 344 n. 2 (2d Cir.1999). A service mark includes words used "to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown." 15 U.S.C. § 1127.

as easily describe a company producing home furnishings, seat covers for automobiles [12] or services such as carpet cleaning or wall painting. As a suggestive mark, "Bihari Interiors" is inherently distinctive and entitled to protection.

### b. Commercial Use

The plain language of the Lanham Act makes apparent that § 43(a) is only applicable to commercial uses of another's mark. *First*, the statute only applies to actions taken by individuals "in connection with any goods or services." 15 U.S.C. § 1125(a)(1); *see also Int'l Ass'n of Machinists and Aerospace Workers, AFL–CIO v. Winship Green Nursing Ctr.*, 914 F.Supp. 651, 654, n. 2 (D.Me.) (the statutory language "in connection with goods or services" serves the purpose of keeping most applications of the Lanham Act "within the realm of 'commercial speech' " so that "conflicts with the First Amendment are minimized"), *aff'd*, 103 F.3d 196 (1st Cir.1996). *Second*, § 43(a) is limited to uses likely to cause confusion "as to the origin, sponsorship, or approval of [the defendant's] *goods, services, or commercial activities . . . .*" 15 U.S.C. § 1125(a)(1)(A) (emphasis added). *Third*, § 43(a) is limited by 15 U.S.C. § 1125(c)(4)(B), which states that "[n]oncommercial use of a mark" is not actionable under the Lanham Act. *See* 15 U.S.C. § 1125(c)(4)(B); *Planned Parenthood Federation of America, Inc. v. Bucci*, 97 Civ. 0629, 1997 WL 133313, at *7 (S.D.N.Y. Mar. 24, 1997).

■ The commercial use requirement in § 43(a) tracks the commercial speech doctrine as developed by the United States Supreme Court. *See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm. of New York*, 447 U.S. 557, 561, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). Following the Supreme Court's precedent, the Sec-

ond Circuit has explained that "[t]he 'core notion' of commercial speech includes 'speech which does no more than propose a commercial transaction.' " *Bad Frog Brewery, Inc. v. New York State Liquor Authority*, 134 F.3d 87, 97 (2d Cir.1998) (quoting *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 66, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983)).

"The mere use of another's name on the Internet . . . is not per se commercial use." *Bally Total Fitness Holding Corp. v. Faber*, 29 F.Supp.2d 1161, 1166 (C.D.Cal. 1998). Nor do the Gross websites offer any "commercial transaction." Defendants are not interior designers and do not sell visitors any products or services. However, the Gross websites contain hyperlinks to other websites which promote the services of other interior designers. *See supra* Part II.D. The Gross websites effectively act as a conduit, steering potential customers away from Bihari Interiors and toward its competitors, thereby transforming his otherwise protected speech into a commercial use. *See Jews For Jesus v. Brodsky*, 993 F.Supp. 282, 308 (D.N.J.1998) (defendant's site devoted to criticizing the Jews for Jesus movement is commercial because it includes a hyperlink to another Internet site which sells certain merchandise).

### c. Likelihood of Confusion

■ Plaintiffs argue that inclusion of "Bihari" and "Bihari Interiors" in the metatags of the Gross websites is likely to cause confusion. Plaintiffs overstate their case. *See* Memorandum of Law in Support of Plaintiffs' Motion for a Preliminary Injunction ("Pl.Mem.") at 29 ("[I]t is impossible for even the most sophisticated Internet viewer to ascertain at first glance that Gross's web site is NOT sponsored by Bihari or BIHARI INTERIORS."); Supplemental Memorandum of Law in Sup-

---

**12.** "Starclass Interiors," a company which produces seatcovers and convertible tops for vehicles, received federal trademark registration. *See Int'l Star Class Yacht Racing Ass'n.*

*v. Tommy Hilfiger, Inc.*, 94 Civ. 2663, 1994 WL 681720, at *2 n. 1 (S.D.N.Y. Dec. 2, 1994).

port of Plaintiffs' Motion for a Preliminary Injunction ("Pl.Sup.Mem.") at 8. Because the purpose of the websites is to injure Bihari Interiors commercially, no reasonable viewer would believe that the disparaging comments regarding Bihari's business ethics—comments which appear on the first page of the websites—are endorsed by Bihari. Moreover, in the instant case, there is no "lengthy delay between attempting to access plaintiff's home page and learning that one has failed to do so." *See Planned Parenthood*, 1997 WL 133313, at *8 (finding likelihood of confusion where viewer misled by website to believe that it is the Planned Parenthood website and deception is not clarified until user links to other pages of the website). Therefore, any likelihood of confusion is minimal.[13]

### d. Initial Interest Confusion

█ Even if actual confusion is unlikely, Plaintiffs argue that there is a likelihood of "initial interest confusion." *See* Pl. Sup. Mem. at 7–10. Accepting, arguendo, the concept of initial interest confusion in an Internet case,[14] Bihari has failed to prove a likelihood of initial interest confusion.

An infringement action may be based on a claim that the alleged infringement creates initial consumer interest, even if no actual sale is completed as a result of the confusion. In the cyberspace context, the concern is that potential customers of one website will be diverted and distracted to a competing website. The harm is that the potential customer believes that the competing website is associated with the website the customer was originally searching for and will not resume searching for the original website.

The Ninth Circuit recently provided a useful metaphor for explaining the harm of initial interest confusion in cyberspace:

Using another's trademark in one's metatags is much like posting a sign with another's trademark in front of one's store. Suppose West Coast's, [the defendant], competitor (let's call it "Blockbuster") puts up a billboard on a highway reading—"West Coast Video: 2 miles ahead at Exit 7"—where West Coast is really located at Exit 8 but

13. The likelihood of confusion question generally requires analysis of the classic eight factor test established in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961). However, the *Polaroid* factors are of little assistance here. The Gross websites do not sell any goods or directly compete with Bihari Interiors. Even in the Internet context, this case is unique. In instances in which a website uses another entity's trademark in the domain name, application of the *Polaroid* factors is simple because the defendant has adopted a mark—namely, the website domain name—that incorporates or is strikingly similar to another mark. *See, e.g., Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036 (9th Cir. 1999) (defendant adopted domain name of "moviebuff.com"); *New York State Society of Certified Public Accountants v. Eric Louis Assocs.*, 79 F.Supp.2d 331, 340 (S.D.N.Y.1999) (defendant adopted domain name of "www.nysscpa.com" even though the New York State Society of Certified Public Accountants already had a trademark in "NYSSCPA"); *Jews For Jesus*, 993 F.Supp. at 290 (defendant adopted domain name of "jewsforjesus.org"); *Planned Parenthood*, 1997 WL 133313, at *7 n. 9 (defendant adopted domain name of "www.plannedparenthood.com"). However, the Gross websites no longer use the "Bihari Interiors" mark in the domain name. This makes the *Polaroid* factors inapplicable. *See Brookfield Communications*, 174 F.3d at 1062 (stating that using mark in metatags is less likely to cause actual confusion).

14. Although the Second Circuit has not explicitly applied this doctrine in an Internet case, the Ninth Circuit has. *See Brookfield Communications*, 174 F.3d at 1062–63 (relying on *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 257–58 (2d Cir.1987)). In addition, at least two courts in the Second Circuit have analyzed a trademark case involving metatags by applying the initial interest confusion doctrine. *See New York State Society of Certified Public Accountants*, 79 F.Supp.2d at 341; *OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F.Supp.2d 176, 190 (W.D.N.Y.2000); *but see BigStar Entertainment, Inc. v. Next Big Star, Inc.*, 105 F.Supp.2d 185, 207–210 (S.D.N.Y.2000) (refusing to apply initial interest confusion doctrine).

Blockbuster is located at Exit 7. Customers looking for West Coast's store will pull off at Exit 7 and drive around looking for it. Unable to locate West Coast, but seeing the Blockbuster store right by the highway entrance, they may simply rent there. Even consumers who prefer West Coast may find it not worth the trouble to continue searching for West Coast since there is a Blockbuster right there.

*Brookfield Communications,* 174 F.3d at 1064.[15]

The highway analogy pinpoints what is missing in this case. Inserting "Bihari Interiors" in the metatags is not akin to a misleading "billboard," which diverts drivers to a competing store and "misappropriat[es] [plaintiff's] acquired goodwill." *Id.* ("[T]he fact that there is only initial consumer confusion does not alter the fact that [the defendant] would be misappropriating [the plaintiff's] good will."). Far from diverting "people looking for information on Bihari Interiors," as plaintiffs allege, *see* Pl. Sup. Mem. at 8, the Gross websites provide users with information about Bihari Interiors. Furthermore, the Gross websites cannot divert Internet users away from Bihari's website because Bihari does not have a competing website. *See BigStar Entertainment,* 105 F.Supp.2d at 209–10 (stating that initial interest confusion does not arise where parties are not in close competitive proximity).

Furthermore, users are unlikely to experience initial interest confusion when searching the Internet for information about Bihari Interiors. In support of their motion, Plaintiffs' counsel provided a typical search result when "Bihari Interiors" is entered into the search field. *See* Meta-Crawler Search Results from March 16, 2000 ("3/16/2000 Search Results"), Ex. C to 3/16/00 Letter from Brian Maas, Esq., Counsel for Bihari, to Court ("3/16/00 Maas Letter"). The search revealed twelve websites, eight of which appear to be the Gross websites. Of those eight, five bear the heading "Manhattan Interior Design Scam—Bihari Interiors." Each website with that heading contains the following description underneath the title: "This site deals with the problems experienced when hiring a New York City (Manhattan) designer. It discusses Marianne Bihari[,] fraud and deceit and. . . ." 3/16/2000 Search Results, Ex. C to 3/16/2000 Maas Letter, at 1 (ellipses in original). An Internet user who reads this text, and then sees the domain name of "designscam.com" or "manhattaninteriordesign.com", is unlikely to believe that these websites belong to Bihari Interiors or Bihari.[16] *See Brookfield Communications,* 174 F.3d at 1062 (relying on search engine results and different domain names to show that level of confusion is less severe when mark is included as a metatag as compared to mark's inclusion in domain name).

---

**15.** Use of the highway billboard metaphor is not the best analogy to a metatag on the Internet. The harm caused by a misleading billboard on the highway is difficult to correct. In contrast, on the information superhighway, resuming one's search for the correct website is relatively simple. With one click of the mouse and a few seconds delay, a viewer can return to the search engine's results and resume searching for the original website.

**16.** The other three bear the headings "Bihari Poll", "Info Page", and "Guestbook". The description underneath the "Bihari Poll" heading states, in part: "After visiting this site I would: never hire Marianne Bihari or Bihari Interiors. . . ." 3/16/2000 Search Re-

sults, Ex. C to 3/16/2000 Maas Letter, at 2 (ellipses in original). The "Info Page" description states, "If you are thinking of hiring Marianne Bihari or Bihari Interiors, please feel free to e-mail us. We will be more than glad to share with you our. . . ." *Id.* (ellipses in original). The description underneath the "Guestbook" title states, in part, "I almost hired Ms. Bihari ... Hi, I was refered [sic] to this web site by my real estate broker in Manhattan. If any one [sic] on this posting board can recommend a very creative architect / designer it would be greatly appreciated." *Id.* (ellipses in original). No reasonable person would believe that any of these three websites were sponsored or endorsed by Bihari.

The few decisions holding that use of another entity's trademark in metatags constitutes trademark infringement involved very different circumstances. *Niton Corp. v. Radiation Monitoring Devices, Inc.*, 27 F.Supp.2d 102 (D.Mass. 1998), for example, provides a good example of the use of metatags to divert a competitor's customers. *First*, Radiation Monitoring Devices ("RMD") and Niton Corporation ("Niton") were direct competitors. *Second*, RMD did not simply use Niton's trademark in its metatag. Rather, RMD directly copied Niton's metatags and HTML code. As a result, an Internet search using the phrase "home page of Niton Corporation" revealed three matches for Niton's website and five for RMD's website. *See id.* at 104. RMD obviously was taking advantage of Niton's good will to divert customers to the RMD website.

Similarly, in *Playboy Enters., Inc. v. Asiafocus Int'l, Inc.*, No. Civ. A. 97–734–A, 1998 WL 724000, at *3,**6–7 (E.D.Va. Apr. 10, 1998), the court enjoined use of the marks "Playboy" and "Playmate" in the domain name and metatags of defendant's website. The defendant provided adult nude photos on webpages located at "asian-playmates.com" and "playmates-asian.com". The "Playboy" and "Playmate" trademarks were embedded in the metatags such that a search for Playboy Enterprises Inc.'s ("Playboy") website would produce a list that included "asian-playmates.com". *See id.* at *3,*5–6; *see also Playboy Enters., Inc. v. Calvin Designer Label*, 985 F.Supp. 1220, 1221 (N.D.Cal. 1997) (preliminarily enjoining defendant's website, "www.playboyxxx.com" and repeated use of the "Playboy" trademark in defendant's metatags). Defendants in these cases were clearly attempting to divert potential customers from Playboy's website to their own.

Even *Brookfield Communications*, where initial interest confusion was first applied to metatags, presents convincing proof of diversion. Brookfield sought to protect its trademark in its "MovieBuff" software, which provides entertainment-industry information. Brookfield had created a website offering an Internet-based searchable database under the "Moviebuff" mark. The defendant, West Coast, a video rental store chain, registered a site at "moviebuff.com" which also contained a searchable entertainment database. The court held that defendant's use of the "moviebuff.com" domain name constituted trademark infringement. *See id.* at 1061. The court also enjoined West Coast from using any term confusingly similar to "moviebuff" in the metatags based on the initial interest confusion caused by the use of Brookfield's mark, which would redound to West Coast's financial benefit. *See id.* at 1065.

In each of these cases, the defendant was using the plaintiff's mark to trick Internet users into visiting defendant's website, believing either that they were visiting plaintiff's website or that the defendant's website was sponsored by the plaintiff. As more fully discussed below, *see infra* Part IV.A.3.e, Gross's use of the "Bihari Interiors" mark in the metatags is not a bad-faith attempt to trick users into visiting his websites, but rather a means of cataloging those sites.

### e. The Fair Use Doctrine

Even if the Gross websites cause consumer confusion, use of the "Bihari Interiors" mark in the metatags is protected as a fair use. The Lanham Act codified a common law fair use defense in 15 U.S.C. § 1115(b)(4). The fair use doctrine applies to the Internet as readily as to the print media. *See Radio Channel Networks, Inc. v. Broadcast.Com, Inc.*, 98 Civ. 4799, 1999 WL 124455, at **5–6 (S.D.N.Y. Mar. 8, 1999) (permitting defendant's fair use of the term "The Radio Channel" on its website, which transmits broadcasts over the Internet, even though plaintiff had registered the service mark "The Radio Channel").

"Fair use is established when the challenged term is a use, otherwise than as a mark, ... of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party...." 15 U.S.C. § 1115(b)(4). In other words, "fair use permits others to use a protected mark to describe aspects of their own goods." *Car–Freshner Corp. v. S.C. Johnson & Son, Inc.,* 70 F.3d 267, 270 (2d Cir.1995). It is not necessary that the plaintiff's mark be classified as "descriptive" to benefit from the fair use defense. *See id.* at 269–270. Instead, the central considerations are whether the defendant has used the mark (1) in its descriptive sense, and (2) in good faith. *See id.*

### (i) Use of the Term in its Descriptive Sense

The requirement that a trademark be used in its descriptive sense is met where the mark is used in an index or catalog, or to describe the defendant's connection to the business claiming trademark protection. *See Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.,* 166 F.3d 65, 73–74 (2d Cir.1999) (permitting fair use defense where defendant, a company that gathers news articles and sells "abstracts" summarizing the articles, routinely used the plaintiff's mark in the reference line of its abstracts to identify the source of the article abstracted by the defendant); Restatement (Third) of Unfair Competition § 28 cmt. a (1995) (fair use defense protects a subsequent user's use of a personal name designation "if the name is used solely to indicate truthfully the named person's connection with the goods, services, or business."). Applying this general rule to the metatag context, Professor McCarthy states: "[T]he fair use defense applies ... if another's trademark is used in a meta tag solely to describe the defendant or defendant's goods or services...." 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* ("McCarthy"), § 25:69 at 25–137 (4th ed.1999). This position finds support in recent cases.

In *Playboy Enters., Inc. v. Welles,* 7 F.Supp.2d 1098 (S.D.Cal.1998), Playboy sought to enjoin Terri Welles, a former "Playmate of the Month" and "Playmate of the Year", from utilizing the trademarked terms "Playboy" and "Playmate" in the metatags of Welles's website. The court denied the injunction, holding that use of the trademarked terms in the metatags is a fair use. The court stated:

> With respect to the meta tags, the court finds there to be no trademark infringement where defendant has used plaintiff's trademarks in good faith to index the content of her website. The meta tags are not visible to the websurfer although some search engines rely on these tags to help websurfers find certain websites. Much like the subject index of a card catalog, the meta tags give the websurfer using a search engine a clearer indication of the content of a website. The use of the term Playboy is not an infringement because it references not only her identity as a "Playboy Playmate of the Year 1981," but it may also reference the legitimate editorial uses of the term Playboy contained in the text of defendant's website.

*Id.* at 1104; *see also Brookfield Communications,* 174 F.3d at 1066 (stating that West Coast can use Brookfield's trademark on its website to "legitimately ... describe Brookfield's product. For example, [West Coast can] ... include an advertisement banner such as 'Why pay for MovieBuff when you can get the same thing here for FREE?' ").

Here, Gross has included "Bihari Interiors" in the metatags of his websites because the websites provide information about Bihari Interiors and Marianne Bihari. Gross has not used the terms "Bihari Interiors" and "Bihari" in the metatags as a mark, but rather, to fairly identify the content of his websites. In short, Gross uses the "Bihari Interiors" mark in its descriptive sense only.

Moreover, use of the "Bihari Interiors" mark in the metatags of his websites is the only way Gross can get his message to the public. *See Bally Total Fitness,* 29 F.Supp.2d at 1165 ("Prohibiting [the defendant] from using Bally's name in the machine readable code would effectively isolate him from all but the most savvy of Internet users."). A broad rule prohibiting use of "Bihari Interiors" in the metatags of websites not sponsored by Bihari would effectively foreclose all discourse and comment about Bihari Interiors, including fair comment. Courts must be particularly cautious of overextending the reach of the Lanham Act and intruding on First Amendment values. *Cf. Rogers v. Grimaldi,* 875 F.2d 994, 998 (2d Cir.1989) (holding that movie titles using a celebrity's name will not be actionable under the Lanham Act unless the title has no artistic relevance to the underlying work or if the title misleads as to the source or the content of the work); 4 *McCarthy,* § 27:91 at 27–140 ("Whether through the use of statutory interpretation or concern for free speech, traditional protections for commentators and critics on business and commercial affairs must not be jettisoned. It is important to create critical breathing space for legitimate comment and criticism about products and services."). The Second Circuit's warning in a recent Internet case to proceed cautiously when dealing with the frontier of expressive speech on the Internet is particularly instructive:

> In considering whether domain names constitute expressive speech, we observe that the lightning speed development of the Internet poses challenges for the common-law adjudicative process—a process which, ideally while grounded in the past, governs the present and offers direction for the future based on understandings of current circumstances. Mindful of the often unforeseeable impact of rapid technological change, we are wary of making legal pronouncements based on highly fluid circumstances, which almost certainly will give way to tomorrow's new realities.

*Name.Space, Inc. v. Network Solutions, Inc.,* 202 F.3d 573 (2d Cir.2000) (stating that top level domain names may, one day, constitute expressive speech).

**(ii) Gross's Good Faith**

To benefit from the defense of fair use, Gross must have acted in good faith. The inquiry into a defendant's good faith focuses on whether "the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Lang v. Retirement Living Pub. Co., Inc.,* 949 F.2d 576, 583 (2d Cir.1991).

Bihari argues, in a conclusory fashion, that Gross did not adopt the "Bihari Interiors" mark in good faith. Rather, Gross intended to divert individuals searching for information about Bihari Interiors to his websites. *See* Pl. Mem. at 33; Pl. Sup. Mem. at 8. This argument is not persuasive. Metatags serve as a cataloging system for a search engine. Gross has the right to catalog the contents of his websites. Furthermore, the fact that Gross knew of the prior use of the "Bihari Interiors" mark does not in itself prove a lack of good faith. "[P]rior knowledge of [plaintiff's] trade name does not give rise to a necessary inference of bad faith, because adoption of a trademark with actual knowledge of another's prior registration ... may be consistent with good faith." *Lang,* 949 F.2d at 583–84; Restatement (Third) of Unfair Competition § 28 cmt. d ("Knowledge of a prior trademark use of the term does not in itself prove a lack of good faith.").

In addition, the domain names of the Gross websites and the disclaimer prove that Gross is using "Bihari Interiors" in good faith. The domain names of his websites in no way confuse Internet users into believing that his site is actually that of Bihari Interiors. *See, e.g., Planned Parenthood,* 1997 WL 133313, at **8–10 (defendant's anti-abortion website violates the

324

Lanham Act because, among other reasons, it was registered at "www.plannedparenthood.com", and the site greeted users with "Welcome to the PLANNED PARENTHOOD HOME PAGE"). Moreover, the Gross websites include a disclaimer: "Keep in mind that this site reflects only the view points and experiences of one Manhattan couple...." *See* Amended Complaint ¶ 92. Although a disclaimer cannot insulate Gross from liability, it indicates good faith use of the service marks and weighs in Gross's favor. *See Consumers Union of United States, Inc. v. General Signal Corp.*, 724 F.2d 1044, 1053 (2d Cir.1983) ("Disclaimers are a favored way of alleviating consumer confusion as to source or sponsorship"); *Welles,* 7 F.Supp.2d at 1104. Even if the Gross websites are mean-spirited and vindictive, bad faith cannot be imputed as well to Gross's use of the "Bihari Interiors" mark in the metatags. *See Nihon Keizai Shimbun,* 166 F.3d at 74 (holding that use of plaintiff's mark is in good faith even though "other aspects of defendants' behavior may have evidenced bad faith.").

### B. The Common Law Libel Claim

Plaintiffs also seek to enjoin Gross from disparaging Bihari. Bihari alleges that four sets of statements on the Gross websites constitute libel: (1) the allegations that Bihari has "alleged ill intentions", has engaged in "alleged fraud and deceit", has "victimized" her clients, and engaged in a "scam", *see* Amended Complaint ¶¶ 121, 122; *supra* Part II.D; (2) including hyperlinks to the First Amended Complaint because that complaint includes two claims of fraud which were dismissed by the state court judge, with leave to replead only one, *see* Pl. Sup. Mem. at 5, 12; *supra* Part II.A; (3) the following quote from Bihari's Affidavit: "I was arrested and charged with criminal possession of stolen property in the Fifth Degree," Amended Complaint ¶ 62; *see supra* Part II.D; and (4) guestbook entries "invented ... to suggest to other visitors ... that the breadth of the dissatisfaction with Ms. Bihari is broader

than it is," Pl. Supp. Mem. at 11; *see supra* Part II.D.

■ A preliminary injunction is a prior restraint, and as such, "bear[s] a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). Nearly thirty years ago, in *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971), the Supreme Court struck as unconstitutional a state court's order enjoining distribution of leaflets critical of the respondent's business practices. The Supreme Court emphasized:

It is elementary, of course, that in a case of this kind the courts do not concern themselves with the truth or validity of the publication. Under *Near v. Minnesota,* the injunction, so far as it imposes prior restraint on speech and publication, constitutes an impermissible restraint on First Amendment rights.... No prior decisions support the claim that the interest of an individual in being free from public criticism of his business practices in pamphlets or leaflets warrants use of the injunctive power of a court.

*Id.* at 418–19, 91 S.Ct. 1575 (internal citations omitted). This is consistent with Supreme Court decisions holding prior restraints to be presumptively invalid, even when the potential harm was much greater than injury to reputation. *See Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 570, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976) (rejecting prior restraint issued to ensure protection of criminal defendant's Sixth Amendment right to a fair trial); *New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (even during wartime, newspapers not enjoined from publishing papers that government feared could threaten national security).

Our Circuit Court of Appeals has longed warned against enjoining libel: "Equity will not restrain by injunction the threatened publication of a libel, as such, howev-

er great the injury to property may be. This is the universal rule in the United States and was formerly the rule in England." *American Malting Co. v. Keitel*, 209 F. 351, 354 (2d Cir.1913); *see also Crosby v. Bradstreet Co.*, 312 F.2d 483, 485 (2d Cir.1963) ("We are concerned with the power of a court of the United States to enjoin publication of information about a person, without regard to truth, falsity, or defamatory character of that information. Such an injunction, enforceable through the contempt power, constitutes a prior restraint by the United States against the publication of facts which the community has a right to know...."); *Parker v. Columbia Broadcasting System, Inc.*, 320 F.2d 937, 939 (2d Cir.1963).

The lower courts and state courts have taken the same approach. *See, e.g., Stop the Olympic Prison v. United States Olympic Comm.*, 489 F.Supp. 1112, 1124–25 (S.D.N.Y.1980) ("A court of equity will not, except in special circumstances, issue an injunctive order restraining libel or slander or otherwise restricting free speech. To enjoin any publication, no matter how libelous, would be repugnant to the First Amendment to the Constitution, and to historic principles of equity.") (quoting *Konigsberg v. Time, Inc.*, 288 F.Supp. 989, 989 (S.D.N.Y.1968)); *Quinn v. Aetna Life & Casualty Co.*, 482 F.Supp. 22, 29 (E.D.N.Y.1979) (dismissing action to enjoin insurance company from running ads claiming that tort claims resulted in excessive jury awards); *Ramos v. Madison Square Garden Corp.*, 257 A.D.2d 492, 684 N.Y.S.2d 212, 213 (1st Dep't 1999) ("Even if some form of equitable remedy were appropriate for defamation, a dubious proposition at best, the particular equitable relief here sought, in the nature of a prior restraint, is strongly disfavored.").

The rule against preliminarily enjoining libel rests on two grounds. *First,* a preliminary injunction would be unconstitutional as a prior restraint on freedom of expression. "The special vice of a prior restraint is that communication will be suppressed ... before an adequate determination that it is unprotected by the First Amendment." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 390, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973). Prior restraints of future speech are particularly dangerous because of the difficulty courts face in designing an order that does not chill protected speech. *See Latino Officers Ass'n, New York, Inc. v. City of New York*, 196 F.3d 458, 465 (2d Cir.1999) ("The danger of a prior restraint, as opposed to ex post disciplinary action, is precisely that making predictions ex ante as to what restrictions on speech will ultimately be found permissible is hazardous and may chill protected speech."); *McLaughlin v. New York*, 784 F.Supp. 961, 977 (N.D.N.Y.1992) (refusing to enjoin defendant's "blacklisting" of former employee because the "court could not possibly design an order that would be concise enough to avoid chilling defendants' protected speech relating to the plaintiff."). *Second,* injunctive relief is unnecessary because plaintiffs have an adequate remedy at law. *See American Malting Co.*, 209 F. at 356 ("The fact that the false statements may injure the plaintiff in his business or as to his property does not alone constitute a sufficient ground for the issuance of an injunction[ ] [because] [t]he party wronged has an adequate remedy at law."); *McLaughlin*, 784 F.Supp. at 977 (N.D.N.Y.1992) ("The fact that a sufficient after-the-fact remedy, in the form of a defamation suit, would be available to redress future 'blacklisting' prevents this court from awarding plaintiff's request for an enjoinder of defendants' future speech."); *Ramos*, 684 N.Y.S.2d at 213 (refusing to grant declaratory relief in defamation suit because plaintiff can seek post-publication damages).

█ The Gross websites concern the business practices and alleged fraud of a well-known interior designer. Such speech is "arguably within the sphere of legitimate public concern," which imbues

the speech with a heavy presumption of constitutional protection. *See Rookard v. Health and Hospitals Corp.*, 710 F.2d 41, 46 (2d Cir.1983) (complaint of fraudulent and corrupt practices at municipal hospital constitutes speech on a matter of public concern); *Chapadeau v. Utica Observer–Dispatch, Inc.*, 38 N.Y.2d 196, 199, 379 N.Y.S.2d 61, 341 N.E.2d 569 (1975) (under New York law, speech "arguably within the sphere of legitimate public concern" is constitutionally privileged unless the plaintiff proves that the publisher acted in a "grossly irresponsible manner"). Similarly, New York law places a heavy burden on the plaintiff to prove that the disparaging statements are not opinion, which is granted absolute protection. *See Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 179 (2d Cir.2000) (under New York law, burden of proving that statement is not protected opinion rests with plaintiff); *Immuno AG. v. Moor–Jankowski*, 77 N.Y.2d 235, 248–50, 566 N.Y.S.2d 906, 567 N.E.2d 1270 (1991) (holding that expressions of "pure" opinion receive absolute protection under the New York Constitution). Because the burden of proof in New York is so high, the risk that a preliminary injunction would suppress constitutionally protected speech is magnified.

Plaintiffs correctly note that a preliminary injunction is more readily available where the defamation is in furtherance of another tort. *See Trojan Elec. & Mach. Co. v. Heusinger*, 162 A.D.2d 859, 557 N.Y.S.2d 756, 758 (3d Dep't 1990) ("While equity will not intervene to restrain the publication of words on a mere showing of falsity ... [a]n injunction will lie to restrain libel when the publication is made as part and parcel of a course of conduct deliberately carried on to further a fraudulent or unlawful purpose."); 1 Robert D. Sack, *Sack on Defamation*, § 10.6.1 (3d ed. 1999) ("In unusual situations where, for example, defamatory words are in aid of another tort such as fraud, injunction may issue."). Consequently, plaintiffs maintain that Gross's speech is part and parcel of his scheme to harass plaintiffs to settle the State Suit. *See* Pl. Mem. at 15 ("Gross's conduct goes far beyond ordinary libel. Here, Gross has engaged in a deliberate course of conduct designed to harass and pressure Bihari into succumbing to his financial demands by creating and maintaining a web site easily accessible by all her potential customers.").

Plaintiffs' characterization of Gross's speech and conduct as part and parcel of the tort of harassment is not convincing. As discussed *supra* Part II.B. and *supra* Part II.E, plaintiffs have not provided sufficient evidence that Gross's purpose is to harass plaintiffs or extort a higher settlement in the State Suit. At most, plaintiffs have proven that Gross intends to cause plaintiffs commercial harm. *See supra* Part II.E. This intent, however improper, cannot justify a prior restraint of constitutionally protected speech. *See Organization for a Better Austin*, 402 U.S. at 419, 91 S.Ct. 1575 ("The claim that the expressions were intended to exercise a coercive impact on respondent does not remove them from the reach of the First Amendment.... [S]o long as the means are peaceful, the communication need not meet standards of acceptability."); *Quinn*, 482 F.Supp. at 30 ("[T]he protection given to speech directed at issues of public concern [is not] lost because of improper intent of the speaker. The First Amendment protects the speech itself.... '(T)he people in our democracy are entrusted with the responsibility for judging and evaluating the relative merits of conflicting arguments.' It is presumed that in evaluating such speech 'the source and credibility of the advocate' will be considered.") (quoting *First National Bank v. Bellotti*, 435 U.S. 765, 791–92, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978)) (internal citations omitted).

Furthermore, the type of harassment in cases where courts have issued preliminary injunctions is much more egregious than that presented here. Generally, such cases involve an invasion of plaintiff's privacy or defamatory speech directed at a

captive audience. *See, e.g., Metropolitan Opera Ass'n v. Local 100,* 00 Civ. 3613, 2000 WL 872829, \*\*3–5, \*\*6–9,\*13 (S.D.N.Y. June 1, 2000) (upholding injunction against picketing by union members outside the Metropolitan Opera, where union members were engaging in defamatory speech, trespassing, harassment and intimidation of employees and potential donors); *Ansonia Assocs. Ltd. Partnership v. Ansonia Tenants' Coalition, Inc.,* 253 A.D.2d 706, 677 N.Y.S.2d 575, 576 (1st Dep't 1998) (upholding injunction where tenants' coalition was distributing leaflets outside plaintiff's business); *Bingham v. Struve,* 184 A.D.2d 85, 591 N.Y.S.2d 156, 158 (1st Dep't 1992) (upholding injunction where defendant picketed outside plaintiff's apartment building wearing a sign accusing plaintiff of raping her, an accusation which was "unsupported by any objective evidence or corroborating testimony"); *Trojan Elec.,* 557 N.Y.S.2d at 758–59 (upholding injunction where defendant, who was involved in contract dispute with developer of condominium project, was picketing outside project to discourage potential purchasers).

In the case at bar, Gross has not invaded Bihari's privacy or forced his disparaging message on any listener. Although Gross has produced pens with the logo "www.bihariinteriors.com" and may have engaged in "hang-up telephone calls" to Bihari's residence, *see supra* Part II.B, such conduct does not constitute the "truly exceptional circumstances" justifying a preliminary injunction. *See* Floyd Abrams, Prior Restraints, 580 *PLI/PAT* 429, 582 (1999). Moreover, Gross's harassing conduct ceased more than seven months before Bihari filed this lawsuit and plaintiffs have not alleged that the harassment has resumed. *See supra* Part II.B. Most important, plaintiffs are not seeking to enjoin any harassing conduct by Gross. Rather, plaintiffs seek to enjoin the websites, making it quite clear that the speech itself is what plaintiffs are targeting, not Gross's alleged past harassment. In short, plaintiffs have not met the heavy burden required to secure a prior restraint.

## V. Conclusion

For the foregoing reasons, Bihari's motion for a preliminary injunction is denied in its entirety. A pretrial conference is scheduled for October 2, 2000 at 2:30 p.m.