**STRANGE MUSIC, INC. and Patrick Grant, Plaintiffs,**

v.

**STRANGE MUSIC, INC., Travis O'Guin, Aaron D. Yates, d/b/a Tech N9NE, therealtechn9ne.com, M.S.C. Entertainment, mscmusic.com, Mark Cerami, Dave Weiner, Quincy Jones III, QD3 Entertainment, Inc. and qd3entertainment.com Defendants.**

No. 04 Civ. 02915(PKC).

United States District Court,
S.D. New York.

July 1, 2004.

Barry R. Fertel, Yosef Yitzchak Weintraub, Gersten, Savage, Kaplowitz, Wolf & Marcus, L.L.P., New York City, for Plaintiffs.

Robert L. Sherman, Paul, Hastings, Janofsky & Walker LLP, Robert Stephen Meloni, Robert S. Meloni, P.C., New York City, for Defendants.

## MEMORANDUM AND ORDER

CASTEL, District Judge.

This is an action alleging infringement of a common law trademark in the name "Strange Music". The plaintiff Peter Grant is a composer and performer of a genre known as "new music". He and his company Strange Music, Inc., who will be referred to throughout as "sTRANGEmU-SIC",[1] allege that a record label featuring

---

1. According to his complaint, Grant has employed numerous variations of his trademark including the "sTRANGEmUSIC" mark (Complaint ¶ 1), which appears in promotional materials and newspaper clippings concerning Grant's music. See Affidavit of Pat-

hip-hop artists is improperly using the name "Strange Music". More specifically, they allege that the owners and distributors of Strange Music, Inc. ("STRANGE MUSIC") including Travis O'Guin, Aaron D. Yates, d/b/a TECH N9NE ("Yates" and/or TECH N9NE"), therealtechn9ne.com, M.S.C. Entertainment, mscmusic.com, Mark Cerami, Dave Weiner, Quincy Jones III, QD3 Entertainment, Inc. ("QD3") and qd3entertainment.com (collectively "defendants"), violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and New York General Business Law § 360-*l* by their adoption of the STRANGE MUSIC mark after plaintiffs had successfully used the name, thereby creating reverse confusion in the marketplace.[2] Plaintiffs now move for a preliminary injunction against further use of the trademark by defendants.

On June 8, 2004, I held a hearing at which the parties were given the opportunity to present live testimony. At the hearing, Grant testified and certain portions of his compositions, and other hearing exhibits, were admitted into evidence. (June 8, 2004 Hearing Transcript ("Tr.") 17) The parties also submitted numerous affidavits and exhibits in support of their positions. Set forth below are my findings of fact and conclusions of law. For the reasons set forth below, plaintiffs' motion for a preliminary injunction is denied.

### Background

sTRANGEmUSIC is a record label that "manufactures, promotes, distributes and sells" musical recordings created by Grant

"which involve a particular and distinct mix of various musical instruments played to unique compositions" that fall within the "new music" genre. (Complaint ¶ 2) Plaintiffs define "new music" as "contemporary concert music." (Grant Aff't at ¶ 3) At the June 8 Hearing Grant defined "new music" as encompassing "music that is on the forefront of the development of music, the art music of culture. At times it has come from the classical tradition, and now it include[s] music that comes from the electronic tradition and from manipulating the forms of folk traditions and other ways." (Tr. 4) While, according to Grant, new music can have its roots in many different genres of music, a review of The Calendar for New Music, October 2003 (Plaintiffs' Hearing Ex. 13), shows that the majority of new music performers advertised have their origins in classical music. Plaintiffs' submissions also reinforce the connection between classical music and new music by noting that their music (new music) is part of the 1% of the market that classical music encompasses. (Grant Aff't ¶ 22, Ex. M)

Grant created sTRANGEmUSIC in 1998 and registered his domain name and website www.strangemusic.com in July of 1998. (Grant Aff't ¶¶ 12–13) Grant contends that he successfully built his business through the use of his trademark, which is "the identifier of [his] performances, recording label and concert production services" and that sTRANGEmUSIC has "thrived and gained notoriety" in the new music community. (Grant Aff't ¶ 11) Grant also testified that he has become the

---

rick Grant sworn to on April 7, 2004 (Grant Aff't"), Exs. H, I, S. Because both plaintiff and defendant Strange Music, Inc. are phonetically identical, for ease of reference, the entity incorporated by Grant is referred to as "sTRANGEmUSIC" and the entity incorporated by Travis O'Guin and Aaron Yates is referred to as "STRANGE MUSIC."

2. Plaintiffs also refer to claims based in "common law trade name, trademark and service mark infringement, unfair competition, false advertising and misappropriation; and reverse palming off" (Complaint ¶ 1; Pls. Mem. 2) but cite no authority to support these positions.

"strange music man" within the new music community, with his record label serving as his unique signature within that community. (Tr. 57)

In August 2003, Grant became aware that the mark "strange music" was being used by a hip-hop artist known as TECH N9NE. (Grant Aff't ¶ 56; Tr. 49–50) TECH N9NE contends that he used the mark for several years and has built STRANGE MUSIC into a successful and critically acclaimed record label in the field of rap and hip-hop. (Declaration of Aaron Yates, dated May 10, 2004 ("Yates Decl.") ¶¶ 8–9, 12) Defendant O'Guin contends that he became aware of Grant and sTRANGEmUSIC in May of 2003 when he and Yates attempted to register the domain name strangemusic.com on behalf of STRANGE MUSIC. (Declaration of Travis O'Guin, dated May 10, 2004, ("O'Guin Decl.") ¶ 20) Defendant Yates claims that he only became aware of Grant in the summer of 2003 when Grant posted a number of messages on an on-line fan forum. (Yates Decl. ¶ 13) TECH N9NE and STRANGE MUSIC have been more commercially successful than Grant and sTRANGEmUSIC. sTRANGEmUSIC's gross compact disk sales from 1998 to date are approximately $15,000. (Grant Aff't ¶ 21) STRANGE MUSIC's gross sales from 2001 to date are $5,590,000. (O'Guin Decl. ¶ 12) When Grant became aware of defendants' use of the mark, both he and his attorneys contacted defendants and demanded that they cease using the mark commercially. Defendants refused. (Grant Aff't ¶¶ 56–58, Ex. 10, Tr. 51–52)

■ Plaintiff therefore brought this action on a reverse confusion theory maintaining that they have been injured and continue to be injured because "consumers are likely to mistakenly believe that the better-known junior user, Defendants, are the source of the goods and services of the senior user, Plaintiffs." (Pl.Mem.13–14) Reverse confusion describes "the phenomenon in which the junior user's advertising so greatly overshadows that of the senior user that consumers come to the mistaken conclusion that the junior user is in fact the source of the *senior user's* goods." *Sunenblick v. Harrell*, 895 F.Supp. 616, 625 (S.D.N.Y.1995), *aff'd*, 101 F.3d 684, 1996 WL 280477 (2d Cir.1996) (Table), *cert. denied*, 519 U.S. 964, 117 S.Ct. 386, 136 L.Ed.2d 303 (1996) (emphasis-in-original). To support this theory, plaintiffs set forth anecdotal evidence of telephone calls and e-mails suggesting that some consumers erroneously believe that plaintiffs compose, perform and sell compact disks ("CDs") and merchandise related to rap and hip-hop. (Grant Aff't ¶¶ 50–55; Reply Affidavit of Patrick Grant sworn to May 26, 2004 ("Grant Reply Aff't") ¶ 6, Exs. I, J, Tr.48–49) In short, Grant asserts that, solely by reason on the name confusion, defendants' hip-hop fans think, he too, is a hip-hop artist.

■ The central focus of a reverse confusion case is the confusion suffered by the senior user's customers—not that of the junior user. As the Second Circuit noted in *Lang v. Retirement Living Publishing Co., Inc.*, 949 F.2d 576, 583 (2d Cir.1991), evidence that the junior user's customers are confused and believe the senior user to be the source of the junior user's goods is not probative of a reverse confusion claim. *See also, Sunenblick*, 895 F.Supp. at 631 ("[e]vidence that would support a finding of reverse confusion would be instances of prospective purchasers of [plaintiff's] products who though they emanated from [defendants]" not vice versa.).

### Discussion

■ To obtain a preliminary injunction plaintiffs must show (1) irreparable harm and (2) either (a) a likelihood of

success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary relief. *Brennan's, Inc. v. Brennan's Restaurant, LLC.*, 360 F.3d 125, 129 (2d Cir. 2004). In a trademark infringement or false designation case, "proof of a likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm." *Id.* Therefore, the merits of plaintiffs' claims are of central importance to an assessment of their entitlement to injunctive relief.

I. *Standard for a Claim Under Section 1125(a)*

▆▆ To succeed under section 1125(a), a plaintiff must satisfy a two-part test. First, the plaintiff must show that their mark is entitled to protection. *See Abercrombie & Fitch Co., v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976). This can be done easily if the mark is federally registered. 15 U.S.C. §§ 1057(b), 1115(a). If it is not, as is the case here, the plaintiff must prove that their common law mark is entitled to protection. *See Courtenay Communications Corp. v. Hall*, 334 F.3d 210, 214 n. 2 (2d Cir.2003). Grant attempted to register his trademark with the U.S. Patent and Trademark Office ("PTO") in September 2003. (Grant Aff't ¶ 16) His application is still pending before the PTO, according to documents annexed to his Affidavit. (Grant Aff't Ex. E) The protection afforded to a common law mark is determined on a sliding scale from a mark that is "generic" and entitled to no protection to the intermediate levels of trademark protection including marks that are "descriptive" with secondary meaning or marks that are "suggestive", to the final level of trademark protection for marks that are "fanciful or arbitrary." *Abercrombie & Fitch*, 537 F.2d at 9.

▆▆ If a plaintiffs can demonstrate that their mark is entitled to protection, plaintiffs must meet the next hurdle—showing that there is a likelihood that consumers will be misled or confused as to the source of the goods in question. *See Brennan's, Inc.* 360 F.3d at 129. In order to determine if there is a "likelihood of confusion", courts look to the *Polaroid* factors which include: (1) the strength of the mark; (2) the degree of similarity between the two marks; (3) the competitive proximity of the products; (4) the likelihood that the prior owner will bridge the gap between the products; (5) actual confusion; (6) the defendant's good faith in adopting its own mark; (7) the quality of defendant's product; and (8) the sophistication of the buyers. *Polaroid Corp., v. Polarad Electronics. Corp.*, 287 F.2d 492, 495 (2d Cir.1961). Each *Polaroid* factor must be considered in the context of the other factors, and no single factor is dispositive of the likelihood of confusion. *See Nikon, Inc. v. Ikon Corp.*, 803 F.Supp. 910, 915 (S.D.N.Y. 1992). Additionally, all factors "must be evaluated in the context of how it bears on the ultimate question of likelihood of confusion as to the source of the product." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872 (2d Cir. 1986).

A. *The First Prong: Plaintiffs' Entitlement to Protection of Its Mark*

As a threshold matter this Court must determine if plaintiffs' common law mark is entitled to protection. In other words, have plaintiffs met the burden of demonstrating that their mark is distinctive? *See Courtenay Communications*, 334 F.3d at 214 n. 2. In determining if plaintiffs' mark is distinctive and entitled to protection the Court must examine the levels of protection set forth in *Abercrombie &*

*Fitch.* *See Thompson Medical Co., Inc. v. Pfizer Inc.,* 753 F.2d 208, 212 (2d Cir.1985) (applying Judge Friendly's four classifications in *Abercrombie & Fitch* to determine if an unregistered mark is entitled to protection).

◼ In *Abercrombie & Fitch,* the Second Circuit set forth the four recognized "categories of terms with respect to trademark protection." 537 F.2d at 9 "Arrayed in an ascending order which roughly reflects their eligibility to trademark status and the degree of protection accorded, these classes are (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *Id.* A "generic" mark is not entitled to any trademark protection because such marks lack specific meaning. *Id.* The next level, a "descriptive" mark, is one that directly "conveys an immediate idea of the ingredients, qualities or characteristics of the goods." *Id.* at 11. These marks are only protected if the plaintiff can show that the marks have acquired a secondary meaning, namely "that despite describing the nature of the goods in question, such marks have come to be associated by the purchasing public over time with a single, albeit anonymous, source." *Sunenblick,* 895 F.Supp. at 624. The next two layers of protection concern marks that are "inherently distinctive" and do not require any additional showing of a secondary meaning. A suggestive mark is one that "requires imagination, thought and perception to reach a conclusion as to the nature of the goods." *Abercrombie & Fitch,* 537 F.2d at 11. Fanciful marks are marks that use words that are unfamiliar in language and are coined for the purpose of trademark identification; arbitrary marks employ terms which are linguistically familiar but do not describe or suggest any attribute of the goods or services sold. *Sunenblick,* 895 F.Supp. at 624.

◼ Plaintiffs do not argue that their mark is arbitrary or fanciful and therefore automatically entitled to protection; nor do defendants argue that plaintiffs' mark is wholly generic. The disagreement lies in the distinction between a "descriptive" and "suggestive" mark with plaintiffs taking the position that the mark is suggestive and defendants taking the position that it is merely descriptive.

Plaintiffs contend that their mark is "suggestive" because it prompts an "imaginative leap" in the listener, "suggest[ing] that the listener will encounter something different and unexpected, . . . It invites the listener to determine what is 'strange' about the music." (Pls.Mem.16) Defendant TECH N9NE claims to have chosen the name based upon the song "People Are Strange", popularized in 1967 by the group, the Doors. (Yates Decl. ¶ 3) Both artists claim to have chosen the moniker "strange music" for its ability to invoke in the listener a feeling that they are hearing a musical composition or performance that is out of the norm—something atypical and unusual.

The word "strange" is evocative of the unusual, the unexpected, the out-of the ordinary and its use with the word music suggests some thought process is involved to reach a conclusion as to the nature of the goods, or in this case, the nature of the music.

· The Court in *Sunenblick,* was faced with a similar situation. In that case, two record companies fought over the use of the name "uptown records." Both parties sought to use the word "uptown" because "it signifies African–American culture of the inner city." *Sunenblick,* 895 F.Supp. at 624. The plaintiff sought to invoke the Harlem jazz scene of the 1930's and 40's while the defendants sought to invoke "'hip' 'cool' . . . electric, urban black cul-

ture.'" *Id.* at 625. The Court found that the mark was suggestive, noting:

> an ordinary purchaser examining [plaintiff's] products would not, upon examining his trademark (if indeed that purchaser were even to pay any attention whatsoever to the mark) be led immediately to the conclusion that the music recorded therein was 'straight ahead jazz' or even jazz at all. Nor would the ordinary purchaser of [defendant's] music be led immediately to the conclusion that *his* music described a particular form of music. In each case, some degree of imagination, perhaps assisted by consideration of the product itself, would be required for such purchasers to invest the respective marks with their intended mental association. *Id.* (emphasis in original)

The sTRANGEmUSIC mark is similar to the "uptown" mark; the buying public upon viewing the mark on either plaintiffs' or defendants' products would not immediately discern to which genre of music it belonged. Some thought process would be involved. Plaintiffs' mark is therefore suggestive.

## B. *Second Prong: Likelihood of Confusion—The Polaroid Factors*

The next issue that this Court must decide is whether the duel use of the mark sTRANGEmUSIC/STRANGE MUSIC causes consumers to be misled or confused as to the source of the goods. Central to the evaluation of this question is an examination of the theory of "reverse confusion" and an examination of the *Polaroid* factors.

### 1. *Strength of the Trademark*

The strength of a trademark "refers to its ability to identify the source of the goods being sold under its aegis." *Brennan's Inc.*, 360 F.3d at 130. "There are two components of a mark's strength: its inherent distinctiveness and the distinctiveness it has acquired in the marketplace." *Id.* at 130–31. "[C]ourts classify a mark in one of four categories in increasing order of inherent distinctiveness: generic, descriptive, suggestive, and arbitrary." *Streetwise Maps. Inc. v. VanDam, Inc.*, 159 F.3d 739, 744 (2d Cir.1998). Distinctiveness in the marketplace turns on the recognition of the plaintiffs' mark in the relevant marketplace. *See Brennan's, Inc.* 360 F.3d at 132.

In a reverse confusion case the court should look to the strength of the junior user's mark "because the doctrine of reverse confusion properly should focus, not on the senior user's mark, but that of the intervening junior user." *Sunenblick*, 895 F.Supp. at 627; *Brockmeyer v. Hearst Corp.*, 248 F.Supp.2d 281, 295 n. 2 (S.D.N.Y.2003). Prior to examining the junior user's mark, however, the Court will consider the strength of plaintiffs' (the senior user) mark.

The Court has already addressed the question of the inherent distinctiveness of plaintiffs' mark and concluded that the mark is suggestive. This classification, however does not end the inquiry. The Court must now turn to the question of the distinctiveness that plaintiffs' mark has gained in the marketplace. *See Streetwise*, 159 F.3d at 744 ("Suggestiveness, however, does not necessarily determine the issue regarding the strength of the mark.... [The Court] must still consider the mark's distinctiveness in the marketplace."); *Sunenblick*, 895 F.Supp. at 626 ("Put another way, a mark may be conceptually strong and yet commercially weak if the mark lacks the requisite 'origin-indicating' quality in the eyes of consumers. Consequently ... evidence of secondary meaning is always relevant to assessing the strength of the mark under the *Polar-*

*oid* test.") (citations omitted). In evaluating distinctiveness in the marketplace, courts examine whether the mark has gained a secondary meaning. *See Swatch Group (U.S.) Inc., v. Movado Corp.,* 2003 WL 1872656, at *2 (S.D.N.Y. Apr. 10, 2003) ("A mark's strength is measured by the degree to which it is inherently distinctive, and the court is also permitted to consider the degree to which it is distinctive in the marketplace, in other words, the degree to which the mark has acquired a secondary meaning."). The Second Circuit has enumerated six factors that are considered when evaluating secondary meaning: (1) the senior user's advertising and promotional expenses; (2) consumer studies linking the name to the source; (3) the senior user's sales success; (4) third-party uses and attempts to plagiarize the mark; (5) length and exclusivity of the mark's use; and (6) unsolicited media coverage of the products at issue. *Thompson Medical,* 753 F.2d at 217. These factors do not weigh in favor of a determination that plaintiffs' mark has gained distinction in the marketplace.[3]

First, plaintiffs have spent few resources on the promotion and advertising of sTRANGEmUSIC's products. Plaintiffs point to only one publication in which they have consistently advertised and they have failed to show the expense of that advertisement. (Grant Aff't ¶ 30; Tr. 60) Plaintiffs have set up a website to promote their works, but, again, plaintiffs fail to show the expense associated with that promotional vehicle. (Grant Aff't ¶ 29) There can be little doubt, however, with gross sales of $15,000 over a 5-year period, that plaintiffs' advertising budget is relatively small.[4] Plaintiffs have not put forth any consumer studies to demonstrate that sTRANGEmUSIC is linked to Grant in the minds of consumers. Grant's success in the music industry has been limited. Grant's music has played on a number of radio stations and his work has been lauded by the new music community. (Grant Aff't Exs. N, Q–S) But grossing $15,000 over five years and the sale of 1,310 CDs does not amount to "success" within the confines of the secondary meaning test. *See Sunenblick* 895 F.Supp. at 627 (Grammy nominations, some radio play, a number of favorable reviews from the jazz community and the sale of fewer than 5,000 copies per record not deemed to be a success within the meaning of *Thompson Medical* ).

Additionally, plaintiffs have been unable to demonstrate that, save for defendants, third parties have used or attempted to plagiarize their mark. Both plaintiffs and defendants have put forth ample documentation of the use of the term "strange music" to describe different types of music appearing on the Internet. (Declaration of Robert L. Sherman, dated May 11, 2004, ("Sherman Decl.") Ex. 1; Grant Reply Aff't Exs. A–G) However, there is no link between these uses and plaintiffs' mark. *See Scarves by Vera, Inc. v. Todo Imports*

---

3. The theory of "secondary meaning in the making", *i.e.* that their mark has not yet gained a secondary meaning within the marketplace but should be protected from a competitor who knowingly rushes into the market with a product under a similar mark, has been squarely rejected by the Second Circuit. *See Laureyssens v. Idea Group, Inc.,* 964 F.2d 131, 137 (2d Cir.1992).

4. Plaintiff points to the promotional distribution of approximately 2,860 free CDs. (Grant Aff't Ex. J) This Court has no way of ascertaining the cost of these CDs. Valuing the CDs at their face retail value does not give an accurate portrayal of the monies spent by plaintiffs. Moreover, the Court has no way of measuring the level of direct mail advertising that plaintiff contends it conducts (Tr. 56–57) because plaintiff has proffered no evidence to support these activities.

*Ltd., (Inc.),* 544 F.2d 1167, 1173–74 (2d Cir.1976); *Sunenblick,* 895 F.Supp. at 627.

Plaintiffs have also been unable to assert that the length of use of their mark and the unsolicited media coverage surrounding sTRANGEmUSIC have generated a secondary meaning. The five-year use of the mark alone is not probative of sTRANGEmUSIC's secondary meaning, nor are the dozen or so unsolicited articles that praise Grant's music. Indeed, in *Sunenblick,* 895 F.Supp. at 627, the Court noted that the plaintiff's use of the mark for eleven years and the adulation of certain segment of the music industry, including numerous Grammy nominations, are not enough to establish a secondary meaning.

Plaintiffs have adduced evidence that their mark has strength within the new music community and has gained distinctiveness within this niche of the musical market. (Tr. 57–58) However, this segment of the market, by plaintiffs' own admissions (Grant Aff't ¶ 22, Ex. M), is minuscule, and therefore the distinctiveness of plaintiffs' mark within the new music community is not probative of the distinctiveness of plaintiffs' mark upon the market on the whole. *See Tri–Star Pictures, Inc. v. Unger,* 14 F.Supp.2d 339, 348 (S.D.N.Y.1998) (stating that a "substantial segment" of the consuming public must identify the product with the source in order to establish a secondary meaning). Plaintiffs seek an injunction reaching the music market as a whole and it is the distinctiveness of plaintiffs' mark in this broader market that is at issue.

Having determined that plaintiffs' mark is weak, the Court must now turn to the strength of defendants' mark because plaintiffs will be able to prevail if they can establish, under a reverse confusion theory, that the strength of defendants' mark is causing consumer confusion. From the submissions of both parties, it is obvious that defendants' mark is stronger than plaintiffs' mark. The sales and advertising budget of STRANGE MUSIC ($5,5900,00 in gross retail sales from 2001 to date; advertising and promotional expenditures of $3,350,000 in the same period) far exceed those of sTRANGEmUSIC. Additionally, according to Yates, defendants' CDs are sold in major retail outlets like Best Buy, Tower Records, Target and Wal–Mart. (Yates Decl. ¶ 11) While no consumer surveys have been submitted showing defendants' penetration into the market, both parties agree that defendants' mark is strong and has gained notoriety within the consumer marketplace. This factor therefore weighs in favor of plaintiffs.

### 2. *Similarity of the Marks*

In considering the degree of similarity between the marks, a court should address "two key questions: (1) whether the similarity between the two marks is likely to cause confusion and (2) what effect the similarity has upon prospective purchasers. In deciding whether the marks are similar as used, [a court does] not look just at the typewritten and aural similarity of the marks, but how they are presented in the marketplace." *The Sports Authority, Inc. v. Prime Hospitality Corp.,* 89 F.3d 955, 962 (2d Cir.1996) (citation omitted).

STRANGE MUSIC and sTRANGEmUSIC when spoken are identical, however an examination of the marks as they appear in the marketplace demonstrates the contrast between the two marks. Both marks appear on the parties' products, including CDs, promotional materials, and on the respective parties' websites. (Grant Aff't Exs. H–I, 2–4)

I have reviewed the two marks and find that they differ greatly; the fonts, colors and emblems are not alike. For example,

the STRANGE MUSIC mark is almost always accompanied by the bat and snake logo. (O'Guin Decl. ¶ 11) This logo, as it appears on defendants' CDs, in most instances, dwarfs the "strange music" moniker that appears beneath it. Plaintiffs' mark, on the other hand, lacks an accompanying picture. Plaintiffs' mark is also customarily presented on a single line of text; the defendants' is laid out on two lines. In addition plaintiffs' mark usually appears in a font that differs from defendants' font with the *s* in strange appearing in lower case and the *m* in music appearing in lower case but with all the other letters appearing in capital; plaintiffs employ no space between the *e* in strange and the *m* in music. The marks do not create the same overall impression and their appearance in the marketplace is unlikely to confuse consumers.

### 3. *Proximity of the Marks*

In considering the proximity of the products, a court examines the extent to which the products compete with each other and how this competition leads to customer confusion. *See Brennan's Inc.,* 360 F.3d at 134; *Lang,* 949 F.2d at 582. The competitive proximity factor has two elements, market proximity and geographic proximity. *See Brennan's Inc.,* 360 F.3d at 134. While plaintiffs contend that they have established proximity in the marketplace because their recordings and defendants' recording are within the music industry (Pls.Mem.19), the fact that both parties' products exist within the same industry is not enough. *See Lang,* 949 F.2d at 582 (fact that parties' products were both in the field of publishing was not enough to establish that proximity caused confusion); *Sunenblick,* 895 F.Supp. at 629 (fact that the parties' products were both in the music industry was not enough to demonstrate that the products' proximity caused consumer confusion). The Court

should "compare all aspects of the products, including price, style, intended uses, target clientele, typical distribution channels, and others." *Brockmeyer,* 248 F.Supp.2d at 296.

There is little doubt that the parties' products do not currently compete with each other for the same customer base. However, as both of the parties' products exist within the same industry, the Court will examine how this fact influences the greater question of how the parties competitive proximity would lead to a likelihood of customer confusion.

Both "strange music" marks appear on the back of the parties' CDs under the listing of the songs that appear on the CD. (Grant Aff't Ex. I; O'Guin Decl. Ex. A) In addition, the STRANGE MUSIC logo appears on merchandise ranging from water bottles to t-shirts. (O'Guin Decl. ¶ 14, Ex. D) However, little consumer confusion arises out of the appearance of the respective marks on the parties' products. Plaintiffs' CDs, unlike defendants' CDs, do not appear to be sold in traditional music store or outlets. (Tr. 29) Nor are they sold through Amazon.com or other on-line stores. (Grant Aff't ¶ 69; Tr. 29) Grant testified that his CDs are sold "primarily" through his performances and website. (Tr. 29) Based upon these facts, there is little doubt that consumers would be confused by the proximity of the parties' products because the parties' recording are sold through different channels of distribution.

The sole basis of confusion due to the "proximity" of the products lies in an online search for plaintiffs' or defendants' products though a search engine like Google or Yahoo! Such a search would direct the searcher to either strangemusic.com (plaintiffs' website) or strangemusicinc.com (defendants' website). (Grant Reply Aff't

¶ 3, Exs. A–F) Plaintiffs assert that this creates confusion in the marketplace. "Internet initial interest confusion [can] arise[ ] when a consumer who searches for plaintiff's website with the aid of a search engine is directed instead to defendants' site because of a similarity in the parties' web addresses." *Savin Corp. v. The Savin Group*, 2003 WL 22451731, at *12. However, due to the ease with which the consumer could return to the search results posted by the search engine, courts in this district have held that so called internet initial confusion requires a showing of intentional deception on the part of the defendant before imposing liability. *Id. See also Bihari v. Gross*, 119 F.Supp.2d 309, 321 (S.D.N.Y.2000). Plaintiffs have made no assertion that defendants have intentionally crafted their website to create such confusion.

Common sense dictates that upon arrival at each site, a consumer looking to purchase a CD by either party would immediately know if they had reached the wrong website. *See Bihari*, 119 F.Supp.2d at 320 n. 15. ("on the information superhighway, resuming one's search for the correct website is relatively simple. With one click of the mouse and a few seconds delay, a viewer can return to the search engine's results and resume searching for the original website.") Devotees of hip-hop would know from the appearance, content, and music that plays upon logging on to strangmusic.com that STRANGE MUSIC's products are not sold there. Similarly, a cursory glance at the strangemusic-inc.com site would be sufficient to inform a new music aficionado that Grant's compositions are not available for sale though that site. The consumer need only link into the products section of that website to ascertain that the music sold on the site is related to rap and hip-hop. Furthermore, as demonstrated by Grant's Affidavit, a search on Google or Yahoo! for "strange

music" would produce numerous search results. (Grant Reply Aff't Exs. A–F) Upon the Court's own search, Google and Yahoo! report over 50,000 sites employing the words "strange music". A consumer looking for Grant's music would presumably link into one of the thousands of sites located by the search engine. The existence of these thousands of sites employing the words "strange music" is not alleged to be a result of the actions of these defendants. Grant has pointed out that "using the best known search engines results in [his website's] prominent listing." (Grant Reply Aff't ¶ 3) He has failed to establish that, upon arriving at TECH N9NE's website, the would-be purchaser of Grant's music would "wrongfully believe that [Grant's] music is being produced by defendants." (Grant Reply Aff't ¶ 3) This confusion is the central crux of plaintiffs' reverse confusion claim.

Plaintiff did not elect to offer evidence of any survey conducted to measure confusion. As noted, plaintiffs have established that several individuals have e-mailed or phoned Grant about STRANGE MUSIC's products and services (Grant Aff't ¶¶ 50–55, Exs.7–8; Grant Reply Aff't ¶ 6, Exs. I, J) but this evidence does not establish that there is overall confusion in the marketplace. A small number of instances of customer confusion have not been found by other courts to evidence consumer confusion. *See Lang*, 949 F.2d at 583; *Sunenblick*, 895 F.Supp. at 631.

### 4. *Bridging the Gap*

"Bridging the gap refers to the senior user's interest in preserving avenues of expansion and entering into related fields." *Hormel Foods Corp. v. Jim Henson Productions, Inc.*, 73 F.3d 497, 504 (2d Cir. 1996) (quotations and citations omitted). This factor involves a determination of the likelihood that the plaintiff will enter the

defendants' business or of the average customer's perception that the plaintiff would enter the defendants' market. Plaintiffs contend that they intend to bridge the gap by "expand[ing] [their] compositions to include many of the sounds of rap and hip hop." (Grant Aff't ¶ 64; Tr. 43–47) Such an intention does not equate to bridging the gap. In order to bridge the gap, plaintiffs must demonstrate that they intend to enter the market of defendants and that prospective customers are aware of this intention. *Lang*, 949 F.2d at 582. Plaintiffs have failed to establish such an ambition. Plaintiffs' Hearing Exhibit 10 contains snippets of plaintiffs' music which Grant believes evidences sTRANGEmUSIC's intent to "bridge the gap" into defendants' market because its uses beats associated with rap and hip-hop. But, in order the bridge the gap, plaintiffs must show that plaintiffs intend to enter defendants' market and that prospective consumers are aware of this intent. *Lang*, 949 F.2d at 582. Exhibit 10 and Grant's accompanying testimony establishes neither. The tracks selected by Grant, containing ambient "new music", do not evidence Grant's intent to enter into the hip-hop market nor do the songs evidence consumers' awareness of this intent. Indeed, I find that Grant's music as compared with the tracks which he selected as examples of other artists' hip-hop are fundamentally dissimilar. Fusing certain sounds or beats that could be identified as related to hip-hop or rap within plaintiffs' works does not equate to the creation of hip-hop or rap music. *See Sunenblick*, 895 F.Supp. at 630 (plaintiffs' intention to produce jazz/hip-hop combination recordings is a "fry cry from joining the market for hip-hop recordings as a competitor of [defendants]."). Based in part upon plaintiffs' concentration on classical music elements and music without lyrics, I find that Grant's music will not transform to such an extent that his creations will compete with those of TECH N9NE and STRANGE MUSIC. I am not persuaded by Grant's testimony that he intends to bridge the gap by using similar beats and equipment used in the hip hop industry and his assertion that "it would be difficult to ... write new music without incorporating the aural environment that popular music foists upon us all." (Grant Aff't ¶ 64) I conclude that plaintiffs have failed to meet their burden of proving an intent to enter into the rap and hip-hop market.

I note that, Grant contention that the defendants' music would tarnish his image within the marketplace (Grant Aff't ¶¶ 68–73) cuts against his assertion that he intends to bridge the gap. *See Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F.Supp.2d 410, 419 (S.D.N.Y.2002) ("In view of plaintiff's concern that defendant's use of plaintiff's marks may tarnish them, it would be surprising if plaintiff had such plans [to bridge the gap].") (quotations and citations omitted).

### 5. *Actual Confusion*

The only evidence of actual confusion proffered by plaintiffs is misdirected phone calls and e-mails they received from defendants' customers. This does not establish reverse confusion. *See Lang*, 949 F.2d at 583 ("misdirected phone calls are not relevant because, even if we infer in Lang's favor that they reflect consumer confusion, those consumers erroneously believed that the senior user (Lang) was the source of the junior user's (Retirement Living) magazine. Evidence of actual reverse confusion that might support Lang's claim would involve purchasers or prospective purchasers of Lang's products who believed that they were produced by or affiliated with Retirement Living's magazine."). In order to establish reverse confusion, plaintiffs must set forth evidence that their

consumers have come to the mistaken conclusion that defendants are the source of plaintiffs' goods. Plaintiffs have put forth no such evidence.

As the Second Circuit noted in *Lang* "trademark infringement protects only against mistaken purchasing decisions and not against confusion generally." 949 F.2d at 583 (quotations and citation omitted). Plaintiffs have put forth no credible evidence that their consumers have been confused or that their purchasing decisions have been influenced by this confusion. While plaintiffs do put forth two declarations from foreign promoters that they will not include plaintiffs' work in upcoming festivals or commission additional pieces because of the presence of defendants' mark, they have not satisfactorily linked those decisions with plaintiffs' customers' actual confusion as to the source of plaintiffs' goods. (Declaration of Stephane Martin, dated May 26, 2004 ("Martin Decl.") ¶ 6; Declaration of Ricardo De Quesada, dated June 1, 2004 ("De Quesada Decl") at ¶ 7) Unsupported conclusory assertions that there is a "substantial likelihood" that consumers would be confused as to the origins of plaintiffs' music are not enough to establish actual confusion. As noted, plaintiffs have not offered the results of any survey to measure customer confusion.

### 6. *Defendants' Good Faith*

The presence or absence of good faith on the part of the defendants is relevant. I must examine "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Sports Authority*, 89 F.3d at 964 (quotations and citations omitted). There is no evidence supporting the proposition that defendants adopted the STRANGE MUSIC mark be-

cause it sought to capitalize on plaintiffs' reputation and goodwill within the music industry. Indeed, defendants contend that they did not become aware of plaintiffs until 2003, years after Yates had adopted the mark and after defendants had incorporated their business under the STRANGE MUSIC label in 2000. (O'Guin Decl. ¶ 20) Defendants also contend that they adopted the mark in 1997 (O'Guin Decl. ¶ 4; Yates Decl. ¶¶ 3, 5), a year prior to plaintiffs' first official use of the mark in July, 1998. (Grant Aff't ¶ 13; Tr. 5)

Plaintiffs do not dispute the fact that defendants adopted the mark for a reason other than capitalizing on plaintiffs' reputation. However, plaintiffs contend that the defendants' bad faith can be measured by their failure to cease using the mark once plaintiffs informed them that the mark belonged to them. Evidence of a failure to discontinue does not *per se* establish defendants' bad faith. As the Supreme Court noted long ago:

> Defendants' persistence in their use of the design after notice proves little or nothing against them. They had been advertising their goods by name and using the design in connection with the name. The natural interpretation is not that they wanted to steal the plaintiff's good will of which they then learned for the first time, but that they wished to preserve their own.... If the defendants' conduct was a wrong, ... it was a wrong knowingly committed, but no further inference against the defendants can be drawn from the fact. *Straus v. Notaseme Hosiery Co.*, 240 U.S. 179, 181–182, 36 S.Ct. 288, 289, 60 L.Ed. 590 (1916).

There is insufficient evidence of lack of good faith by defendants to tip the scales on this factor in plaintiffs' favor.

### 7. Quality of the Products:

The quality of music is a subjective inquiry and one that this Court need not delve into because the relative quality of the parties' products does not create consumer confusion. *See Sunenblick,* 895 F.Supp. at 634. While plaintiffs cite to a number of misogynic, violent and adolescent lyrics found in defendants' songs, it is unclear that an ordinary purchaser of plaintiffs' music, even if aware of defendants' music and the content of its lyrics, would become confused and that this confusion would affect their purchasing decisions. Again, this Court remains unmoved by the bald assertions found in the Martin and DeQuesada declarations that they refrained from promoting plaintiffs' music because of the competing STRANGE MUSIC mark held by defendants. The assertions made in these two declarations do not set forth why they believe that the competing sTRANGEmUSIC/STRANGE MUSIC marks will cause confusion or that there is actual confusion in the marketplace which led Martin and DeQuesada to decide not to promote plaintiffs' music.

### 8. Sophistication of the Purchasers:

In considering the sophistication of purchasers, a court must evaluate "[t]he general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods. . . ." *McGregor–Doniger, Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1137 (2d Cir.1979) (quotations and citations omitted) *superseded by rule on other grounds, Bristol–Myers Squibb, Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033 (2d Cir.1992). Plaintiffs contend that the relatively low price of CDs suggests that the sophistication of the buyers of the parties' products is low and little care is given to their decision to purchase. The low price of a CD, however, does not necessarily lead to the conclusion that a purchaser is unsophisticated. *See Sports Authority,* 89 F.3d at 965 ("Of course, price alone is not determinative of the care a consumer will take in making purchases, and our touchstone remains the general impression that is left with the ordinary consumer."). As the Court noted in *Sunenblick:*

> customers of musical recordings are necessarily discriminating as between jazz and hip-hop, and are not likely to suffer confusion in the same manner as customers who might purchase less easily differentiated goods bearing confusingly similar trademarks. Recalling once more that the relevant inquiry under *Polaroid* is whether a given factor sheds light on the likelihood of confusion, the court agrees with defendants that buyers of musical recordings are relatively sophisticated consumers whose purchasing decisions are driven by a recognition of and search for a particular artist or composition, and whose awareness of the record label—if such awareness even exists at the time of purchase—is at best a peripheral concern compared to the contents of the recording. . . . The notion that customers typically enter a record store with the request, 'Please show me the MCA records', or 'Where can one find your *Deutsche Grammophon* CD's' is simply counter-intuitive. 895 F.Supp. at 634

Likewise, shoppers on the Internet, who seek to purchase either party's products, are relatively sophisticated and will not suffer confusion when they search for these products on the web. The consumer is not shopping for a fungible good—6–inch round, laser discs. Typically, he or she is searching for an artist's composition or performance. As the Court noted in *1–800 Contacts, Inc. v. WhenU.com,* 309 F.Supp.2d 467, 502 (S.D.N.Y.2003), "Internet shoppers have a specific product in

mind when they go online and have the ability to navigate the Internet to get what they want." *See also, Q Division Records, LLC v. Q Records*, 2000 WL 294875, at *5 n. 14 (D.Mass. Feb. 11, 2000) (applying factors similar to the *Polaroid* factors, finding that internet shopping has not changed consumers' buying habits to such an extent that shoppers buy CDs solely by record label).

### 9. Conclusion on Polaroid Factors

The Court has considered all of the relevant factors in determining whether there is a likelihood of confusion and finding that there is none, concludes that there is neither a likelihood of success on the merits of plaintiffs' section 1125(a) claim nor sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in plaintiffs' favor. In assessing plaintiffs' request for injunctive relief, however, the Court must still consider plaintiffs' state law claim. This inquiry will once again direct the Court to an examination of the merits of plaintiff's claims.

### II. Standard for a Claim Under New York's Anti–Dilution Statute

■ To succeed on a claim under N.Y. General Business Law § 360–*l*, a plaintiff "must prove (1) that the trademark is truly distinctive or has acquired secondary meaning, and (2) a likelihood of dilution either as a result of 'blurring' or 'tarnishment.'" *U–Neek v. Wal–Mart Stores, Inc.*, 147 F.Supp.2d 158, 175 (S.D.N.Y. 2001). "[T]o merit protection under the New York dilution statute, a plaintiff cannot simply show that she possesses trademark rights; rather, she must possess a trademark or name which is 'truly of distinctive quality' or which has 'acquired a secondary meaning in the mind of the pub-

lic.'" *Scholastic, Inc. v. Stouffer*, 221 F.Supp.2d 425, 437 (S.D.N.Y.2002). Therefore "only extremely strong marks" will be entitled to protection. *Welch Allyn Inc. v. Tyco International Services*, 200 F.Supp.2d 130, 150 (N.D.N.Y.2002) (*citing Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 625 (2d Cir.1983)). While this does not mean that the mark must be famous, weak marks will not be subject to a dilution claim under this statute. *Id.*

■ In examining the "distinctiveness" of a mark, a court looks to the same factors that are examined when assessing the strength of a mark in the context of a section 1125(a) claim. *See Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1030 (2d Cir. 1989) ("[d]istinctiveness for dilution purposes often has been equated with the strength of a mark for infringement purposes."); *Swatch Group*, 2003 WL 1872656, at *6 (same). The Court has examined these factors in relation to the strength of plaintiffs' mark within the confines of section 1125(a) and, as more fully set forth above, concluded that plaintiffs' mark is weak and has not acquired a secondary meaning. As plaintiff has failed to establish this threshold requirement, the Court need not examine whether plaintiffs' mark was "blurred" or "tarnished" by defendants.

### Conclusion

The Court concludes that there is neither a likelihood of success on the merits of plaintiffs' claims nor sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in their favor. The request for a preliminary injunction is therefore DENIED.

Defendants Quincy Jones III, QD3 and qd3entertainment.com agreed to consent to an injunction. I held plaintiffs' request

to enter the Jones/QD3's consent in abeyance until the decision of the present motion. In view of the foregoing, I decline to enter the agreement as an order of the Court.

SO ORDERED.